STATE V. MCCLURE, et al. 2004 NCBC 8

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| WAKE COUNTY | 03-CVS-005617 |

State of North Carolina, *ex rel*. Roy
Cooper, Attorney General, and North
Carolina Department of Environment
and Natural Resources,

        Plaintiffs,

        v.

Darin M. McClure, Thomas A. Proctor,
Mid-Atlantic Associates, P.A.,
Catherine A. Ross, CBM Environmental
Services, Inc., North Carolina Environmental
Service Providers Association, d/b/a NCESPA,
John A. Hill, and John Does 1 through 100,

        Defendants.

-

ORDER AND OPINION

{1}    This case arises out of plaintiffs' claim that defendants engaged in illegal business practices in their efforts to influence prices paid under state contracts for environmental services. Plaintiffs bring claims against defendants for price fixing, providing deceptive survey information, solicitation of a group boycott, solicitation of price fixing, conspiracy to restrain trade involving a state contract, facilitation of price fixing, providing false certificates of non-collusion and kickback schemes.

{2}    Defendant organizations named in the complaint are: North Carolina Environmental Service Providers Association ("NCESPA"); Mid-Atlantic Associates, P.A. ("Mid-Atlantic"); CBM Environmental Services, Inc. ("CBM"); Shield Engineering, Inc. ("Shield"); S&ME, Inc. ("S&ME"); SEI Environmental, Inc. ("SEI"); Environmental Conversation Laboratories ("ENCO"); South Atlantic Environmental Drilling and Construction Company ("SAEDACCO"); and Almes & Associates, Inc. ("Almes").

{3}    Individual defendants named in the complaint are: Darin M. McClure ("McClure"), president and co-owner of Mid-Atlantic and president of NCESPA; Thomas A. Proctor ("Proctor), vice president and co-owner of Mid-Atlantic; Catherine A. Ross ("Ross"), CEO of CBM and vice president and director of NCESPA; Keith A. Anthony ("Anthony"), vice president of Shield and director of NCESPA; William A. Quarles ("Quarles"), assessment and remediation services manager at S&ME and director of NCESPA; Matthew R. Einsman ("Einsman"), environmental engineering manager at S&ME and director of NCESPA; Michael D. Shaw ("Shaw"), senior geologist at SEI and director of NCESPA; James H. Hays ("Hays"), employee of ENCO and treasurer and director of NCESPA; Peter I. Byer ("Byer"), president of SAEDACCO and director of NCESPA; and John A. Hill ("Hill"), employee of Almes and director of NCESPA.

{4}    NCESPA, Mid-Atlantic, S&ME, Shield, SEI, ENCO, SAEDACCO, Almes, McClure, Proctor,

Anthony, Quarles, Shaw, Hays and Byer all later entered into consent judgments and dismissals with plaintiffs. Therefore, the remaining defendants that bring the motions to dismiss are: CBM, Ross and Hill.

{5} Plaintiffs seek civil penalties of $5,000 from each remaining defendant, treble damages from defendants that engaged in the conspiracy, a permanent order enjoining defendants from engaging in the alleged unlawful conduct, and reimbursement of plaintiffs' attorney fees by defendants.

{6} Remaining defendants filed N.C. R. Civ. P. 12(b)(6) motions to dismiss on all claims and assert several doctrines that they claim immunize them from any liability in this matter.

*Office of the Attorney General by K.D. Sturgis, Gary R. Govert and Kimberly W. Duffley for Plaintiffs State of North Carolina, ex rel. Roy Cooper, Attorney General, and North Carolina Department Environment and Natural Resources.*

*Smith Moore LLP by Jon A. Berkelhammer, Shannon R. Joseph and Marc Tucker for Defendant John A. Hill; Ellis & Winters, LLP by Matthew W. Sawchak, Julia Youngman, and Danielle Rose for Defendants Mid-Atlantic Associates, Inc., Darin M. McClure and Thomas A. Proctor; Hunton & Williams by Douglas W. Kenyon for Defendants Darin M. McClure, Thomas A. Proctor and Mid-Atlantic Associates, Inc.; Richard H. Tomberlin for Defendants CBM Environmental Services, Inc. and Catherine A. Ross; John F. Graybeal for Defendant North Carolina Environmental Service Providers Association.*

## I.
### FACTUAL BACKGROUND

{7} This case centers on the bidding process between the State of North Carolina and contractors of environmental services. More specifically, the matter arises in the context of the statutory framework created by the North Carolina General Assembly to fund the cleanup of underground storage tanks ("USTs"). The framework requires that the North Carolina Department of Environment and Natural Resources ("DENR") reimburse tank owners or operators ("responsible parties") for the reasonable and necessary costs incurred in cleaning up the aftermath from leaking USTs. Funds for paying the cleanup costs come from fees charged to all tank owners. The fund created by these fees seldom suffices to meet the needs of DENR for cleanup reimbursements.[1]

{8} As a means of controlling its reimbursement expenses, DENR sets specific rates for environmental services. Those rates are published in its Reasonable Rate Document ("RRD"). DENR solicits the typical billing rates of engineers, geologists and other environmental consultants in order to calculate the reimbursement rates for these costs. DENR then issues the RRD providing the reimbursement rates for the services that the responsible parties employ in the cleanup processes. While private parties contract for services at different rates, the rates contained in the RRD have a significant influence on marketplace pricing. Thus, the rates set in the RRD affect both DENR reimbursement and nongovernmental marketplace pricing.

{9} In addition to the reimbursement method, DENR also must contend with the cleanup of UST leaks on property whose owners cannot be located. DENR contracts with specific environmental consultants to carry out the cleanup of these contaminated properties. These environmental consultants obtain the contracts, referred to as "state lead work," through a bidding process in which bidders respond to a request for proposals ("RFPs"). This process also affects marketplace pricing. DENR uses information obtained in connection with these RFPs in setting rates in the RRD.

{10}    In 2001 DENR published proposed revisions to the RRD that potentially would have affected environmental consultants, engineers and geologists by setting rates paid for environmental services at a level that was unsatisfactory to defendants.  Shortly thereafter, the State requested RFPs for some state lead work.

{11}    In response to the potential changes, a group of environmental consultants, engineers and geologists created an informal association referred to in the briefs as the "Stakeholders Group."  In 2002 members of the Stakeholders Group formed a nonprofit corporation under North Carolina law officially named the North Carolina Environmental Service Providers Association.  NCESPA accordingly elected a board of directors that included McClure and Hill.

{12}    Defendants are alleged to have taken two specific actions to cause DENR to raise the rates from those proposed in the 2001 revision.  First, the State alleges that defendants provided a reasonable rate survey that contained false, inflated billing information.  Second, the State alleges that the defendants sought to improperly influence the prices submitted in RFPs for the state lead work.  The State alleges that defendants believed DENR would use the information gathered through the RFPs for the state lead work to set rates in the RRD, and that if inflated bids were submitted, the RRD rates would be higher.

{13}    Before the incorporation of NCESPA, the leader of the Stakeholders Group, McClure, requested that the persons and entities associated with the Stakeholder Group complete a "reasonable rate survey."  Plaintiffs allege that McClure engaged in an e-mail campaign to inflate the RRD by having the Stakeholders submit artificially inflated rate information.  McClure later stated in text within the distributed survey, however, that responses to the survey should include the true and reasonable rates of environmental service providers so that the revised RRD would reflect the typical industry billing rates.

{14}    The Stakeholder Group NCESPA then submitted the reasonable rate survey results to DENR.  Contention exists as to whether (1) NCESPA falsified these surveys and (2) DENR actually considered the survey in calculating rates that it would pay environmental service providers.  Defendants, however, conceded during oral arguments that for the most part they knew that the rates they provided on the surveys were false.  On a 12(b)(6) motion the Court must accept plaintiffs' allegations as true.

{15}    In August 2002, DENR published a RFP for state lead work.  The parties dispute NCESPA's reaction to the RFP and related motivations.  Plaintiffs allege that McClure and NCESPA responded to the RFP with a "two pronged course of action."  First, plaintiffs allege that defendants organized a boycott of the RFP based on the claim that the request violated the Mini-Brooks Act.  Second, defendants allegedly fixed the bids by having firms submit bids at the rates determined by NCESPA and its members.  Plaintiffs allege that defendants' motivation in these two actions was to inflate the rates paid to the parties to whom the State awarded the contract and to impact the rate-setting process by preventing the State from using good faith bid information to set the RRD rate.  On a 12(b)(6) motion the Court must accept plaintiffs' allegations as true.

{16}    Defendants claim that plaintiffs' allegations misrepresent defendants' actions.  They claim to have legitimate concerns that DENR's RFP did indeed violate the Mini-Brooks Act.  NCESPA members claim that they did not suggest rates to its members but merely attached the aforementioned reasonable rate survey which contained artificially inflated prices.  Defendants concede that some NCESPA members submitted responses to the RFP with rates from the artificially inflated reasonable rate survey, while others did not respond or submitted rates not based on the survey.

{17}    Plaintiffs allege the responses were coordinated and nefarious and that defendants submitted bids

at NCESPA-constructed rates. CBM, moreover, submitted a bid with NCESPA rates marked up by 20%. Defendants Hill and Almes, Hill's employer at the time, did not respond to the RFP. Plaintiffs also assert that bids submitted by defendants included a certification, under oath, of non-collusion by the bidders. DENR claimed that the coordinated use of the NCESPA rates and boycott constituted collusive behavior and hence subjected defendants to penalties because the signed certification by defendants violates N.C.G.S. § 143-54.

{18} In January 2003, DENR published a new RRD (the "2003 RRD") that was effective as of March 1, 2003. The 2003 RRD eliminated reimbursement to consulting firms for markup on such subcontractor costs as laboratory work and drilling. Plaintiffs contend that McClure and Mid-Atlantic entered into agreements with subcontractors to inflate invoices up to 15%, which was the maximum reimbursement rate allowed under the former 1998 RRD, and to rebate part of the price increase, thus hiding the markup eliminated by the 2003 RRD. These allegations were made against Mid-Atlantic and McClure only.

{19} In summary, the allegations of the Complaint that the Court must accept as true may be summarized as follows: Defendants colluded to artificially increase the rate of reimbursement set by DENR under the RRD in two ways. First, they provided DENR with a survey of typical billing rates which they knew contained false and artificially inflated billing rates. Second, fearing that the bids submitted under the August 2002 RFP would be used in the rate-setting process, defendants attempted to artificially influence the bidding process by encouraging those who bid to collusively use either the artificially inflated NCESPA survey rate or a higher rate or to abstain from bidding altogether. Their alleged goal was to prevent DENR from obtaining accurate information on market prices for environmental cleanup services. Theoretically, the interference was designed, like the survey, to mislead DENR as to actual market pricing.

{20} Defendants argue on this motion that even if these allegations are true, their activities are protected free speech and activity immune from challenge under the *Noerr-Pennington* doctrine. This Court does not agree.

## II.

## LEGAL STANDARD

{21} When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted." *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true. *See Hyde v. Abbott Laboratories, Inc.*, 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996). The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. *See id.*

## III.

## ANALYSIS

## A.

## FIRST AMENDMENT IMMUNITY

*1.* Noerr-Pennington *Doctrine*

{22} The First Amendment provides the basis for immunity from antitrust laws for private persons that petition the government, even if the request of the government is anticompetitive in nature. *City of Columbia v. Omni Outdoor Advertising, Inc*., 499 U.S. 365, 379-80 (1991); *Eastern Railroad Presidents*

*Conference v. Noerr Motor Freight*, 365 U.S. 127, 140 (1961). This immunity, referred to as the *Noerr-Pennington* doctrine, protects from antitrust liability a private party that uses **proper means** in an attempt to influence a public official, regardless of selfish motive, purpose or intent. *City of Columbia*, 499 U.S. at 398; *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).

{23}    *Noerr-Pennington* clearly extends to administrative agencies, and no case law exists that suggests the doctrine would not cover the petitioning of an agency such as DENR. *See Pennington*, 381 U.S. at 669-70 (holding that a union is not subject to antitrust liability for petitioning the Secretary of Labor and Tennessee Valley Authority). In North Carolina, the *Noerr-Pennington* doctrine also applies to state law claims. *See Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 157, 555 S.E.2d 281, 293 (2001); *Sunbelt Rentals v. Head & Enquist Equip., L.L.C.*, 2003 NCBC 4 at ¶330 (No. 00 CVS 10358, Mecklenburg Super. Ct. May 2, 2003)(Tennille, J.).

{24}    The unresolved issue, however, is which behaviors by private persons constitute petitioning or, more specifically, whether protected petitioning, as defined under *Noerr-Pennington,* occurs when an entity submits false data to a public agency, charged with administering a trust fund, for the purpose of inflating reimbursement rates. In the present case, this Court must determine if the *Noerr-Pennington* doctrine classifies the allegedly falsified bids and rates surveys submitted by defendants as protected petitioning and hence immunizes them from antitrust liability.

{25}    *Noerr-Pennington* does not classify every action by a private party as petitioning. The doctrine generally protects petitioning activity, but the scope of the protection afforded to a petitioning activity depends on the source, context, and nature of the anticompetitive restraint that is at issue. *Allied Tube & Conduit Corp., v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Determining the scope of protection under *Noerr-Pennington* requires an analysis of the above factors in the case at hand. *See id.*

{26}    First, this Court examines whether the efforts to restrain trade flows from a governmental or private source. In *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), the Supreme Court addressed conduct that would likely result in pecuniary gain for the petitioners. In *Superior Court Trial Lawyers*, attorneys that represented indigents boycotted representing such clients in an effort to obtain higher rates for this work from the District of Columbia. Although the boycott sought a political impact by influencing the District's City Council, the Supreme Court held that the restraint would ultimately benefit the attorneys who were private market participants. *Id.* at 426. Thus, the restraint on trade at issue in *Superior Court Trial Lawyers*, the attorney boycott, was the means to obtain favorable legislation and not the consequence of public action. *Id.* at 424. The Supreme Court further reasoned that the ultimate objective of the boycott was gaining an economic advantage for attorneys from the governmental indigent defense system and, thus, an anticompetitive restraint.

{27}    Similarly, in the case at hand, the efforts of defendants were aimed toward obtaining more favorable rates from DENR for their environmental consulting work. The effort to restrain trade flowing from the private action of artificially inflated bids and rates surveys submitted by defendants was much like the boycott of the attorneys in *Superior Court Trial Lawyers*. Moreover, like those boycotts, defendants sought economic gain by submitting inflated bids and rate surveys to DENR. The alleged goal of the petitioners in both cases was to employ such anticompetitive means as boycotts and inflated bids for economic gain. In other words, the anticompetitive behaviors were not governmental action, but the petitioning activities of the private association to influence the rate setting of the respective government agency in each case. Under *Superior Court Trial Lawyers*, therefore, the trade restraint of increased rates

flows from private actions, and this Court must now determine the context of defendants' petitioning activities.  *See Allied Tube & Conduit*, 486 U.S. at 499.

{28}    In addition, both the case at hand and *Superior Court Trial Lawyers* differ from *Noerr* with respect to the action of the petitioners.  In *Noerr*, the petitioning railroads waged a campaign seeking the passage of trade restraint laws that were unfavorable to the trucking industry.  365 U.S. at 138-40.  The trade restraint was anti-trucking laws, which were the **intended consequence** of the public action.

{29}     In both *Superior Court Trial Lawyers* and this case, the trade restraint, the boycotts and inflated bids were the **means** that the petitioners employed to obtain favorable governmental action.  The trade restraints in these were not intended consequences but instead improper means not protected by *Noerr-Pennington*.[2]  *See City of Columbia*, 499 U.S. at 398; *Pennington*, 381 U.S. at 670.  Thus, the actions of defendants in this case do not receive the same protection because their actions were both a trade restraint and an improper means to obtain a favorable governmental action.  *Cf. Noerr*, 365 U.S. at 138-40.

{30}    The Court now turns to the context and nature of defendants' petitioning activity to determine if they may avail themselves of immunity from antitrust liability under the *Noerr-Pennington* doctrine.  *Id.* Protection  under *Noerr-Pennington* starts with the general rule that "[c]oncerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability . . . ." *Id.*  When the petitioning activity, however, involves a less political arena such as is found in the administrative and judicial processes, then unethical or deceptive practices may result in petitioner liability under antitrust laws.  *Id.* at 499-500; *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512-13 (1972).  Given the existence of some self-regulating industries, the context and nature component of the *Noerr-Pennington* analysis often involves the role of private associations.  *See Superior Court Trial Lawyers*, 486 U.S. at 500.

{31}    In *Allied Tube*, the petitioner, a large steel manufacturer, sought to exclude a plastic conduit from the list of approved electrical conduits under the National Electrical Code (the "NEC") of the National Fire Protection Association (the "NFPA").  486 U.S. at 495-96.  The petitioner met with over 200 members of the steel conduit industry and packed the NFPA meeting to successfully prevent the addition of the plastic conduit to the NEC.  *Id.* at 496-97.  The manufacturer of the plastic conduit unsuccessfully appealed the vote to the NFPA Board of Directors, then subsequently filed suit in federal court, claiming that petitioners and others violated the Sherman Act by not adding the plastic conduit to the approved list in the  NEC.  *Id.* at 496-97.  The petitioner and other defendants raised the *Noerr-Pennington* doctrine in an attempt to immunize themselves from antitrust liability.

{32}    The U.S. Supreme Court approached the analysis of the context of the petitioning activity as occurring within a private standard setting association.  *Id.* at 500.  The Supreme Court reasoned that private associations have the capacity to inflict anticompetitive harm in the marketplace with their standard setting processes.  *Id.* at 501.  Moreover, the Supreme Court found that the members of a private association, unlike the government, have economic incentive to restrain trade.  *Id.* at 501-02.  Thus, the Court found that petitioning activity and the resultant exclusion of the plastic conduit from the NEC occurred in a non-political arena where decisions were motivated not by public interest, but by economic gain.  The personal financial interests advanced by NFPA stripped the petitioner of immunity from antitrust liability under the *Noerr-Pennington* doctrine.  *Id.* at 501-02.

{33}    In the case at hand, the petitioning activities allegedly included submitting rate surveys and bids set by NCESPA, a private association, and its members.  As in *Allied Tube*, the members of the private association undertook a petitioning activity that advanced their personal financial interests.  The NFPA

members colluded to exclude a new competitor from the marketplace by using its standard setting power to exclude the product as a safe conduit.

{34}   Similarly, NCESPA coordinated the pricing of services provided by its members and hence inflated the market rates. The exclusion of a new competitor and the inflation of market rates both constitute a restraint on trade. NCESPA and its members' attempts to inflate reimbursement rates, much like the exclusion of the plastic conduit by NFPA in *Allied Tube*, did not benefit the public. The restraints imposed in both *Allied Tube* and in this case were the result of actions by private entities that had interests beyond that of providing a public benefit. While the petitioner in *Allied Tube* did not lobby a government agency, this Court cannot see how the public would benefit in any respect from NCESPA's self-serving petitioning of DENR that would thereby prevent the application of the holding in *Allied Tube*.

{35}   The petitioning activity in this case is perhaps more wrought with personal financial motivation than in *Allied Tube* because the steel manufacturers merely excluded a competitive product as opposed to using collusion to inflate rates for the petitioners. There can be no question that the coordination of NCESPA's members in the bidding and surveying process was designed to increase their revenues. The NFPA members at least had a plausible argument that excluding the plastic conduit may have involved some legitimate safety concerns.

{36}   The petitioning activities of NCESPA clearly do not qualify for immunity under *Noerr-Pennington* for several reasons. First, the anticompetitive restraint flows from the private actions of NCESPA and its members. The submissions of inflated surveys and bids were not the action of a governmental agency, but that of a private group seeking an economic gain. Second, the context of the petitioning activity was undertaken only for financial gain, and NCESPA used the standard-setting power as an industry association to inflate prices and potentially harm the marketplace. The inflated bids resulted in a restraint imposed by a private association and not a governmental agency. This Court therefore denies defendants' motion to dismiss based on the *Noerr-Pennington* doctrine.

### 2. Free Speech Guarantees

{37}   Defendants also claim that the free speech guarantees of the First Amendment and Article I, Sections 12 and 14 of the North Carolina State Constitution immunize them from liability because they have the right to criticize the government. The issue again before the Court is whether the actions of submitting falsified rate surveys and bids rise to the level of protected free speech. Free speech covers a wide spectrum of protection, but the First Amendment does not protect all speech even if it criticizes the government.

{38}   Defendants cite a litany of persuasive authority illustrating the protected speech that persons and corporations enjoy that allows criticism of the government and the general rule that trade associations are not subject to antitrust laws. *See Schachar v. American Academy of Opthamology*, 870 F.2d 397, 399 (7th Cir. 1989) (holding that the medical academy did not violate antitrust laws by urging patients, physicians and hospitals to use a medical procedure sparingly until further research was done); *Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249, 251 (N.D. Ill. 1987) (holding that a non-coercive letter from Visa urging member banks not to use American Express products could not support an antitrust lawsuit); *Progress Development Corp. v. Mitchell*, 219 F. Supp. 156, 163 (N.D. Ill. 1963) (holding that criticism of a municipal government that resulted in decreased bidders at an auction was not sufficient to support a libel claim). Defendants fail to address the distinction between the cases cited and plaintiffs' claims. The problem with defendants' argument is that it protects only the communications between NCESPA members, but not their eventual

wrongful actions.

{39}     The cases cited do indeed support the right of associations to discuss potential actions that may result in antitrust violations. *See Schachar*, 870 F.2d at 399; *Brown*, 674 F. Supp. at 251. The Court, however, has little difficulty distinguishing *Schachar* and *Brown* from the case at hand. The cited cases involve communications from associations that encouraged their members to engage in potential antitrust violations. The communications in *Schachar* and *Brown* are quite different from those that occurred within NCESPA, as the associations in those cases did not encourage members to submit false information to the state government to influence rate setting.

{40}     In addition, the activities that the defendants encouraged in the cited cases do not clearly qualify as collusive behavior. NCESPA's alleged communications, however, urged its members to fix rates that would clearly affect the calculation of the reimbursement rates and government contract awards. These communications concerning fixed bids and false surveys stand in stark contrast to *Brown*, in which a medical academy merely encouraged members to avoid a medical procedure until the completion of further research. 674 F. Supp. at 251. Even the communications in *Schachar*, in which Visa encouraged its member banks to refrain from using American Express products, are not definitively as collusive as the NCESPA e-mails. 870 F.2d at 399.

{41}     Defendants' citation of *Progress Development* supports the right of an entity to criticize the government, but not the right of an association to submit false information to the government.[3] In *Progress Development*, a municipal corporation claimed that libelous statements published by a developer decreased the number of bidders at a bond auction. 219 F. Supp. at 163. The municipality claimed that the decrease in bidders increased the interest rate that it paid to the eventual bondholders. *Id*. The *Progress Development* court held that even though the speech was libelous, criticism of a governmental entity "enjoyed the widest latitude." *Id*.

{42}     The Court finds that the *Progress Development* opinion is not factually analogous to the instant case. NCESPA allegedly encouraged its members to file false statements to a government agency. On the other hand, the developer in *Progress Development* published false statements about the governmental entity. The difference may appear at first to be minimal, but from a public policy perspective, it is decisive.

{43}     For example, the holding in *Progress Development* protects the right of a citizen to claim that DENR is a corrupt and insolvent agency that refuses to pay environmental consultants adequately for services rendered. Clearly, the Constitution protects the right of citizens to make wild assertions against the government. If a court contracted the latitude of criticism allowed, then every protester with a sign that claimed a public agency was corrupt would be bankrupt from litigation. Here, NCESPA could have publicly stated that DENR's rates were unreasonable and so low as to drive providers from the marketplace.

{44}     The same holding, however, does not protect that same citizen from filing untrue estimates and inflated bids in an attempt to impact the amount received from government business. If this Court allowed that citizen to file false bids, then the bidding process for government contracts would be completely worthless. Criticism of the government does not encompass collusion and antitrust violations. NCESPA alternatively could have written a letter to the editor of the *News & Observer* or published an advertisement in that same newspaper criticizing DENR's reimbursement policy. The course of action that NCESPA allegedly chose, however, goes beyond protected speech and into the realm of bid rigging

and collusion.

{45}    Defendants were free to advocate for reimbursement of certain expenses or a fixed percentage for overhead on cleanup projects.  Those same ends may not be accomplished by providing false information to artificially inflate market pricing in order to influence the rate set for reimbursement purposes.

{46}    Defendants offer little authority as to how the North Carolina State Constitution protects NCESPA's activities.   The only case cited by defendants in support of their contentions as to the state constitution is *Corum v. University of N.C.*, 330 N.C. 761, 413 S.E.2d 276 (1992).  Defendants fail to specify how *Corum* "fills in any gaps in *Noerr-Pennington* immunity" with respect to free speech and the North Carolina State Constitution.

{47}    Free speech allowed NCESPA to discuss various alternatives to its dilemma regarding the RRD and bidding process.  However, free speech does not protect such discussions when the resultant actions involve submitting false information and contrived bids to a government agency.

## B.
## STATUTORY IMMUNITY

### 1. Nonprofit Officer & Director Immunity from Monetary Relief

{48}    Defendants raise the defense that as directors and members of a nonprofit they are statutorily immune from liability *in their roles as officer or directors of NCESPA* .  The North Carolina Nonprofit Corporation Act provides immunity for directors by stating, "[A] person serving as a director or officer of a nonprofit corporation shall be *immune individually from civil liability for  monetary damages*, except to the extent covered by insurance, for any act of or failure to act arising out of this service . . . ."  N.C.G.S. § 55A-8-60(a) (2003) (emphasis added).

{49}    The statute, however, also designates several exceptions to the above immunity, including the following conduct by officer and directors of nonprofit corporations: "(3) Was not acting in good faith; (4) Committed gross negligence or willful or wanton misconduct that resulted in damage or injury . . . ."  N.C.G.S. § 55A-8-60(a)(3)-(4).

{50}    Case law on this statute does not exist in North Carolina, but the public policy goal of this statute is clearly to prevent potential litigation from discouraging individuals from serving on nonprofits' boards.  However, the statute is not a means for persons to orchestrate illegal conduct and shield themselves from liability.  The exceptions in the statute exist to prevent nonprofits from becoming conduits for illegal or wrongful conduct.  In other words, the statute does not provide the officers or directors of nonprofits carte blanche to act in bad faith or to harm others with grossly negligent or intentional misconduct.   Here defendants are alleged to have used the nonprofit to further their individual personal gain.

{51}    Plaintiffs seek to hold Hill and Ross individually liable as officers or directors of NCESPA.  The Court must take into account the standard for the motion to dismiss in examining the potential statutory immunity for these individuals at this phase of the case.  The allegations levied against the directors or officers as individuals vary widely, and the Court will apply this immunity and its exceptions accordingly.

{52}    In the context of a motion to dismiss, the Court needs only to consider the alleged conduct and not the credibility of the allegations.

{53}    The allegations against Hill and Ross do not allege the same leadership role that McClure supposedly assumed in the various alleged collusive schemes.  Hill and Ross may have participated in the survey and bidding process, but the allegations do not rise to the level of bad faith or willful or wanton misconduct.

{54}    Defendants Hill and Ross discussed the proposals, and even indicated concern about the legality of the actions.  However, the discussion of strategic options for their organization by a nonprofit's members does not rise to the level of conduct that falls within the exceptions from the immunity.

{55}    Defendants Hill and Ross certainly may be held liable for conduct involving the survey and RFP as individuals, but plaintiffs may not seek monetary relief for their merely participatory conduct as directors or officers of NCESPA.

## C.

### STATE ACTION DOCTRINE

{56}    Defendants argue that state action doctrine precludes plaintiffs' claims because the State intended to replace competition with regulation and actively supervised the challenged conduct.  The basis for defendants' state action immunity assertion is the application of federal antitrust laws to a state legislative scheme.  Plaintiffs, however, contend that the state action doctrine does not apply because the case at hand involves applying state antitrust law to the state regulatory scheme.

{57}    Plaintiffs' argument has merit, but its other assertion that defendants failed to offer evidence in support of the requisite test is more clearly fatal to defendants' attempts to invoke state action immunity. A private party claiming state action immunity must meet a two-pronged test.  *FTC v. Ticor Insurance Co.*, 505 U.S. 621, 633 (1992); *City of Columbia v. Omni Outdoor Advertising, Inc.* 499 U.S. 365, 370-72 (1991).  First, the party must prove a clear articulation and affirmative expression of the state's sovereign intent to displace competition with regulation.  *Ticor*, 505 U.S. at 633.  Second, the government must actively supervise the economic activity in the market in which competition has been displaced.  *Id.*

{58}    The Court first turns to whether DENR clearly expressed and articulated intent to displace competition with regulation among environmental consultants by establishing reasonable rates.  This prong requires that the state possess the authority to suppress competition and clearly articulate a policy that authorizes anticompetitive conduct.  *City of Columbia*, 499 U.S. at 371-72.  Defendants only specifically cite N.C.G.S. § 143-215.94E(e)(2), the statute that limits the reimbursement rate paid by DENR to "reasonable and necessary," to support the allegation that the state's actions rise to the level of suppressing competition and advancing a policy of anticompetitive conduct.

{59}    A statute requiring a government agency to limit its reimbursement to vendors to reasonable and necessary costs can hardly be construed as proliferating anticompetitive behavior.  The argument might hold merit if the statute limited the rates that environmental consultants could charge third parties or responsible parties.  A statute that merely limits what a government agency may reimburse a vendor, however, is a means to prevent government waste and preserve funds raised under the statutory scheme.

{60}    This Court holds that limiting government spending to reasonable and necessary expense does not grant the authority to limit competitive behavior and advance a policy authorizing anticompetitive conduct.  If the State allowed DENR to regulate the rates that consultants may charge third parties then such regulation may affect the competitive markets, but this statute clearly does not grant such broad and unbridled authority.

{61}    Given that defendants clearly do not meet the first prong required for state action immunity, the Court will only cursorily examine the second prong.  The second prong requires the active governmental supervision of economic activity on the market in which competition is displaced.  *City of Columbia*, 499 U.S. at 72.  DENR again does not regulate the rate structure that environmental consultants set for third parties including responsible parties.  The agency merely sets the rate at which it will reimburse the

responsible party, not the rate that the environmental consultants may charge the responsible party. The contractual limitation in the statutory framework applies only to the relationship between DENR and the consultants. The absence of a statute that regulates the contractual relationships between environmental consultants and third parties stifles any argument that DENR supervises the market beyond reimbursing responsible parties.

{62} Therefore, state action immunity does not exist as to defendants because the role of the state in this market does not meet either prong.

## D.

## FILED RATE DOCTRINE

{63} Defendants also raise the filed rate doctrine as a defense to plaintiffs' claims. The filed rate doctrine holds that a plaintiff cannot sustain a claim against a defendant when a regulatory agency approved the rate at issue, even if the rate is excessive as a result of the defendants' unlawful conduct. *N.C. Steel, Inc. v. National Council on Compensation Ins.*, 347 N.C. 627, 632, 496 S.E.2d 369, 372 (1998). In *N.C. Steel*, the plaintiffs were businesses that paid workers' compensation insurance claims. The plaintiff claimed that the insurance companies deceived the North Carolina Commissioner of Insurance (the "Commissioner") about certain fees to obtain approval for inflated rates. Plaintiff sought to reset the rates and recover the excess premiums that resulted from the excessive fees that the insurance companies submitted to the Commissioner. The North Carolina Supreme Court held that the filed rate doctrine applied and barred any claims to recover the excess fees.

{64} The case at hand is too factually dissimilar to *N.C. Steel* to justify the application of the filed rate doctrine. First, this case is a dispute that involves a direct relationship between a state agency, DENR, and a state vendor, the environmental consultants. This relationship involves a government agency setting the rate that it will pay a vendor for its services. In contrast, *N.C. Steel* applies the filed rate doctrine to an agency that is setting rates for the relationship between a regulated business and a third party. The Commissioner in *N.C. Steel* was not controlling the reimbursement rate between the state government and the insurance companies, but instead the allowable rates in the insurance market.

{65} Second, *N.C. Steel* addresses the deference of the courts to rate-making entities and reluctance for judicial tampering with the province of those agencies. The *N.C. Steel* decision employs the filed rate doctrine not to bar all claims involving rates set by a government agency, but clearly to advance the policy that changing established rates is not a matter for the courts. *Lupton v. Blue Cross & Blue Shield of N.C.*, 1999 NCBC 4 at ¶ 12 (No. 98 CVS 633, Orange Co. Super. Ct. June 14, 1999)(Tennille, J.). In contrast, this case does not involve a plaintiff seeking to change the rate structure of a regulated industry. This case instead involves a contrasting scenario in which the plaintiff is the government rate-setting agency and the defendant is a vendor who has tried improperly to influence the rate-setting process. More importantly, the case does not involve a business requesting the government to recalculate rates, but involves government allegations against a business that submitted information in order for an agency to calculate rates.

{66} The filed rate doctrine cannot be applied here because DENR does not regulate the entire market for environmental consultants and, as plaintiff, is not asking the Court to recalculate rates. Moreover, defendants do not contest the rates themselves, as the dispute centers on the events surrounding the information submitted to DENR for rate calculation. Therefore, the filed rate doctrine is not applicable in this case to bar claims against defendants.

# E.
## UNFAIR AND DECEPTIVE TRADE PRACTICES

{67}  Plaintiffs allege defendants' action violated N.C.G.S. § 75-1.1, which is part of the Unfair and Deceptive Trade Practices Act ("UDTPA").  UDTPA defines the elements necessary for an unfair trade practices claim as follows:

> (a)  Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

> (b)  For the purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

{68}  Defendants claim that they cannot be found liable under the UDTPA for four reasons. First, the alleged conduct was not "in or affecting commerce" as required by N.C.G.S. § 75-1.1(a).  Second, defendants claim that they qualify for the "learned profession exemption" in N.C.G.S. § 75-1.1(b), which bars plaintiffs' claims.  Third, plaintiffs did not sufficiently allege that DENR relied on the alleged misstatements.  Fourth, plaintiffs do not allege that a legally recognizable injury resulted from the alleged conduct.

{69}  Defendants assert that the alleged conduct, both the alleged bid rigging and falsified surveys, does not qualify as "in or affecting commerce" because it is incidental to the lobbying of a government agency and not related to commercial transactions.  According to North Carolina case law, however, the conduct at issue—completing rate surveys and bidding on government contracts—likely qualifies as a routine business activity and, thus, is "in or affecting commerce."

{70}  Defendants cite *HAJMM v. House of Raeford Farms*, in which the North Carolina Supreme Court found that securities transactions were beyond the scope of business activities that qualify as "in or affecting commerce" under UDTPA.  328 N.C. 578, 595, 403 S.E. 2d 483, 493 (1991).  The Supreme Court reasoned that issuing securities was an extraordinary event beyond the regular, day-to-day activities that the statute was meant to regulate.  *HAJMM*, 328 N.C. at 593-94, 403 S.E. 2d at 493.  The *HAJMM* court further reasoned that the existing state and federal statutory framework pervasively regulated securities transactions, and extending UDTPA into the securities regulation arena would create overlapping supervision and enforcement issues.  *Id*. at 594, 403 S.E. 2d at 493.

{71}  Environmental consultants routinely deal with DENR and its procedures in procuring business as it pertains to UST cleanup.  The completion of rate surveys does not qualify as an extraordinary event, as they serve as a component of a main revenue driver for environmental consultants.  These activities occur more regularly in the environmental industry than such capital-raising transactions as public offerings or private placements.  While raising capital is a collateral and extraordinary activity, environmental consulting is the activity that these firms were created to perform.  Seeking government contracts and providing rate information to obtain environmental consulting assignments from DENR is a routine activity for these firms.

{72}  On the other hand, the rate setting is an activity that the State regulates within an existing statutory framework.  *See, e.g.,* N.C.G.S. § 143-21 5.94E(e2)(2003); 15A N.C.A.C. 2P.0402(a)(2)(2003).   While the regulations pertaining to the rate-setting function of DENR are not as prolific as that of securities law, the overlap is similar to the problem that the Supreme Court faced in *HAJMM*.  This Court would likely cause conflict between the framework governing the DENR process and the more nebulous unfair trade

practice statute by applying UDTPA to the rate-setting function of an administrative agency. The State has other remedies it can use through the Administrative Procedure Act and its claims under the antitrust laws.

{73} The Court will not analyze the other arguments raised by defendants as to the UDPTA because it clearly does not apply to the conduct alleged by plaintiffs. Therefore, the Court dismisses all claims against defendants under the UDTPA.

## F.
## INTRACORPORATE IMMUNITY

{74} Defendants argue that the intracorporate immunity doctrine shields them from plaintiffs' allegations of price fixing, conspiracy to restrain trade involving a state contract and false certifications or the procurement thereof. The intracorporate immunity doctrine holds that a corporation, its subsidiaries, officers and employees do not provide a sufficient number of actors to carry out an antitrust conspiracy. *Copperweld Corp. v. Independence Corp.*, 467 U.S. 752, 758-59 (1984).

{75} Intracorporate immunity does not apply in this case. The allegations are that actors from several different environmental firms engaged in a conspiracy of price fixing and false certifications. The doctrine would only apply if all the actors were in the same environmental consulting firms. For example, if all of the alleged actors were officers or employees of Mid-Atlantic, then the immunity doctrine might apply. Because the alleged actors in this case were mostly members of different firms, the intracorporate immunity doctrine therefore does not apply.

## G.
## DAMAGES UNDER N.C.G.S. § 133-28

{76} Defendants CBM and Ross argue that DENR's action under N.C.G.S. § 133-28 is distinct from an action in which the plaintiffs seek civil penalties for the damages sustained from the defendants' alleged conspiracy. They assert that plaintiffs fail to allege that DENR suffered any damages from entry into a contract with any of defendants and also argue that the RFPs do constitute a contract. Defendants specifically rely on N.C.G.S. § 133-28 (a)-(b), which states:

> (a) Any governmental agency entering into a contract which is or has been the subject of a conspiracy prohibited by G.S. 75-1 or 75-2 shall have a right of action against the participants in the conspiracy to recover damages, as provided herein. The governmental agency shall have the option to proceed jointly and severally in a civil action against any one or more of the participants for recovery of the full amount of the damages. There shall be no right to contribution among participants not named defendants by the governmental agency.

> (b) At the election of the governmental agency, the measure of damages recoverable under this section shall be either the actual damages or ten percent (10%) of the contract price which shall be trebled as provided in G.S. 75-16.

{77} The Court fails to find that DENR suffered any of the damages required by § 133-28(b). The RFP that DENR selected was awarded to a party that was not a participant in the alleged conspiracy to inflate the contract price paid by DENR. The goal of the alleged conspiracy was to increase the revenue earned by the conspirators for the state lead work that they performed under contract with DENR. In order to obtain the goal of the conspiracy, DENR needed to award an inflated contract to a conspirator. DENR did *not* award any such contract to a conspirator. Instead, DENR awarded the contract to a nonconspirator. Therefore, the contract was not the subject of the conspiracy because the conspirators did not increase the

contract award and thus failed to affect the outcome in a manner that caused damage to DENR.

{78}    The Court will not address the argument that RFPs do not constitute contracts and are by nature illusory.  Plaintiffs' failure to allege that defendants' alleged conspiracy caused the requisite damages under § 133-28 provides sufficient basis for the Court to dismiss the plaintiffs' claims under this statute.

## CONCLUSION

{79}    Based upon the foregoing it is hereby Ordered, Adjudged and Decreed:

1. The motion to dismiss based on the *Noerr-Pennington* doctrine is DENIED.
2. The motion to dismiss based on the Free Speech guarantees of the First Amendment and Article I, Sections 12 and 14 of the North Carolina State Constitution is DENIED.
3. The Court GRANTS the motion to dismiss based on nonprofit officer and director immunity as to Hill and Ross under N.C.G.S. § 55A-8-60(a).
4. The motion to dismiss based on the state action doctrine is DENIED.
5. The motion to dismiss based on the filed rate doctrine is DENIED.
6. The Court GRANTS the motion to dismiss as to all unfair trade and deceptive practice claims.
7. The motion to dismiss based on intracorporate immunity is DENIED.
8. The Court GRANTS the motion to dismiss as to all claims for damages against Hill, Ross, and CBM based on N.C.G.S. § 133-28.

SO ORDERED, this the 14th day of December 2004.

---

[1] Recently the North Carolina General Assembly adopted a policy which further limits spending designated for UST cleanup, resulting in the cessation of cleanup efforts at many UST sites.

[2] Instead, the government action of increasing rates in *Superior Court Trial Lawyers* and the instant case was the consequence of the trade restraint, unlike in *Noerr* where the passage of laws was the trade restraint.

[3] The *Progress Development* court applied Illinois law in this case.