State *ex rel.* Cooper v. McClure, 2007 NCBC 24

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
03 CVS 5617

State of North Carolina, ex rel. Roy
Cooper, Attorney General, and North
Carolina Department of Environment
and Natural Resources,

          Plaintiffs,

          v.

Darin M. McClure, Thomas A. Proctor,
Mid-Atlantic Associates, P.A.,
Catherine A. Ross, CBM Environmental
Services, Inc., Keith A. Anthony, Shield
Engineering, Inc., William A. Quarles,
Matthew R. Einsmann, S&ME, Inc.,
Michael D. Shaw, SEI Environmental,
Inc.,
the North Carolina Environmental
Service Providers Association, d/b/a
NCESPA, James H. Hays,
Environmental Conservation
Laboratories, Inc., d/b/a ENCO, Peter I.
Byer, South Atlantic Environmental
Drilling and Construction Company,
Inc., d/b/a SAEDACCO, John A. Hill,
Almes & Associates, Inc., and John Does
1 through 100,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER ON PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND JUDGMENT

{1}    This case arises out of Plaintiffs' claim that Defendants engaged in illegal business practices in their efforts to influence prices paid under state contracts for environmental services. This matter comes before the Court on Plaintiffs' Motion for Summary Judgment.

{2}     After considering the briefs and oral arguments, the Court GRANTS Plaintiffs' Motion for Summary Judgment on the grounds that Defendants participated in a conspiracy in restraint of trade. Plaintiffs may recover damages in the amount of $350,434.74 from Defendants.

> *Office of the Attorney General by K.D. Sturgis and Kimberly W. Duffley for Plaintiffs State of North Carolina, ex rel. Roy Cooper, Attorney General, and North Carolina Department of Environment and Natural Resources.*
>
> *Richard H. Tomberlin for Defendants CBM Environmental Services, Inc. and Catherine Ross Bateman.*

Tennille, Judge.

## I.

## PROCEDURAL BACKGROUND

{1}     This action was filed in Wake County Superior Court on April 28, 2003. The case was designated "exceptional" under Rule 2.1 of the General Rules of Practice for the Superior and District Courts and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated August 11, 2003.

{2}     The Complaint named the following organizations as defendants: North Carolina Environmental Service Providers Association ("NCESPA"); Mid-Atlantic Associates, P.A. ("Mid-Atlantic"); CBM Environmental Services, Inc. ("CBM"); Shield Engineering, Inc. ("Shield"); S&ME, Inc. ("S&ME"); SEI Environmental, Inc. ("SEI"); Environmental Conservation Laboratories ("ENCO"); South Atlantic Environmental Drilling and Construction Company ("SAEDACCO"); and Almes & Associates, Inc. ("Almes").

{3}     The Complaint named the following individuals as defendants: Darin M. McClure, president and co-owner of Mid-Atlantic and president of NCESPA;

Thomas A. Proctor, vice president and co-owner of Mid-Atlantic; Catherine A. Ross[1], chief executive officer of CBM and vice president and director of NCESPA; Keith A. Anthony, vice president of Shield and director of NCESPA; William A. Quarles, assessment and remediation services manager at S&ME and director of NCESPA; Matthew R. Einsman, environmental engineering manager at S&ME and director of NCESPA; Michael D. Shaw, senior geologist at SEI and director of NCESPA; James H. Hays, employee of ENCO and treasurer and director of NCESPA; Peter I. Byer, president of SAEDACCO and director of NCESPA; and John A. Hill, employee of Almes and director of NCESPA.

{4}    NCESPA, Mid-Atlantic, S&ME, Shield, SEI, ENCO, SAEDACCO, Almes, McClure, Proctor, Anthony, Quarles, Einsmann, Shaw, Hays, Byer, and Hill all later entered into consent judgments and dismissals with Plaintiffs.  Those Defendants paid a total of $735,000 to settle the claims against them.  Bateman and CBM are the only remaining Defendants.

{5}    In 2004, Bateman and CBM brought motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.  The Court granted the motions in part and denied them in part.  *See State* ex rel. *Cooper v. McClure* (*McClure I*), 2004 NCBC 8 ¶ 79 (N.C. Super. Ct. Dec. 14, 2004), http://www.ncbusinesscourt.net/opinions/2004%20NCBC%208.htm.  Plaintiffs subsequently filed a motion for reconsideration of three rulings in the Court's December 14, 2004 Order and Opinion, including (1) the dismissal of Plaintiffs' claims under section 75-1.1 of the General Statutes of North Carolina; (2) the dismissal of Plaintiffs' damages claims against Defendant Bateman on the basis of nonprofit immunity under section 55A-8-60(a) of the General Statutes for her role as an officer and director of NCESPA and (3) the dismissal of all damages claims against Bateman and CBM under section 133-28 of the General Statutes.  The Court denied the motion for reconsideration of the dismissal of all unfair and

---

[1] When the complaint was filed in this action, Defendant Bateman was known as Catherine A. Ross. She married during the course of the litigation and is now known as Catherine Ross Bateman and will be referred to as "Bateman" throughout the remainder of this Order.

deceptive trade practices claims, denied the motion for reconsideration of the dismissal of Bateman under section 55A-8-60(a), and granted the motion for reconsideration of the dismissal of all claims for damages against Bateman and CBM based on section 133-28. *State* ex rel. *Cooper v. McClure* (*McClure II*), 2005 NCBC 6 (N.C. Super. Ct. Oct. 28, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%206.htm. Following the Court's ruling on the motion for reconsideration, discovery proceeded on the section 133-28 claims. Plaintiffs filed a motion for summary judgment on November 13, 2006. The Court heard oral arguments on the motion on January 26, 2007. The only issues presently before the Court are those related to the section 133-28 claims for damages against Bateman and CBM.

## II.
## FACTUAL BACKGROUND
### A.
### THE PARTIES

{6} Plaintiff Roy Cooper is the duly elected Attorney General of North Carolina.

{7} Plaintiff North Carolina Department of Environmental and Natural Resources ("DENR") administers various programs under North Carolina law to prevent and cure damage to the environment and natural resources of the state.

{8} Defendant Catherine Ross Bateman was, at times relevant to this action, a resident of Charlotte, North Carolina. She has subsequently established a residence in Florida. At times relevant to this action she was owner and chief executive officer of CBM.

{9} Defendant CBM is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business located in Fort Mill, South Carolina. CBM is engaged in the environmental consulting business. It maintains an office in Greenville, North Carolina.

{10} All other defendants to this action have been dismissed.

B.

BACKGROUND

{11} The facts giving rise to this action were set out as follows in a previous order:

This case centers on the bidding process between the State of North Carolina and contractors of environmental services. More specifically, the matter arises in the context of the statutory framework created by the North Carolina General Assembly to fund the cleanup of underground storage tanks ("USTs"). The framework requires that the North Carolina Department of Environment and Natural Resources ("DENR") reimburse tank owners or operators ("responsible parties") for the reasonable and necessary costs incurred in cleaning up the aftermath from leaking USTs. Funds for paying the cleanup costs come from fees charged to all tank owners. The fund created by these fees seldom suffices to meet the needs of DENR for cleanup reimbursements.

As a means of controlling its reimbursement expenses, DENR sets specific rates for environmental services. Those rates are published in its Reasonable Rate Document ("RRD"). DENR solicits the typical billing rates of engineers, geologists and other environmental consultants in order to calculate the reimbursement rates for these costs. DENR then issues the RRD providing the reimbursement rates for the services that the responsible parties employ in the cleanup processes. While private parties contract for services at different rates, the rates contained in the RRD have a significant influence on marketplace pricing. Thus, the rates set in the RRD affect both DENR reimbursement and nongovernmental marketplace pricing.

In addition to the reimbursement method, DENR also must contend with the cleanup of UST leaks on property whose owners cannot be located. DENR contracts with specific environmental consultants to carry out the cleanup of these contaminated properties. These environmental consultants obtain the contracts, referred to as "state lead work," through a bidding process in which bidders respond to a request for proposals ("RFPs"). This process also affects

marketplace pricing.  DENR uses information obtained in connection with these RFPs in setting rates in the RRD.

In 2001 DENR published proposed revisions to the RRD that potentially would have affected environmental consultants, engineers and geologists by setting rates paid for environmental services at a level that was unsatisfactory to defendants.  Shortly thereafter, the State requested RFPs for some state lead work.

In response to the potential changes, a group of environmental consultants, engineers and geologists created an informal association referred to in the briefs as the "Stakeholders Group."  In 2002 members of the Stakeholders Group formed a nonprofit corporation under North Carolina law officially named the North Carolina Environmental Service Providers Association.  NCESPA accordingly elected a board of directors that included McClure and Hill [and Bateman].

Defendants are alleged to have taken two specific actions to cause DENR to raise the rates from those proposed in the 2001 revision.  First, the State alleges that defendants provided a reasonable rate survey that contained false, inflated billing information.  Second, the State alleges that the defendants sought to improperly influence the prices submitted in RFPs for the state lead work.  The State alleges that defendants believed DENR would use the information gathered through the RFPs for the state lead work to set rates in the RRD, and that if inflated bids were submitted, the RRD rates would be higher.

Before the incorporation of NCESPA, the leader of the Stakeholders Group, McClure, requested that the persons and entities associated with the Stakeholder Group complete a "reasonable rate survey."  Plaintiffs allege that McClure engaged in an e-mail campaign to inflate the RRD by having the Stakeholders submit artificially inflated rate information.  McClure later stated in text within the distributed survey, however, that responses to the survey should include the true and reasonable rates of environmental service providers so that the revised RRD would reflect the typical industry billing rates.

The Stakeholder[s] Group . . . then submitted the reasonable rate survey results to DENR.  Contention exists as to whether (1) NCESPA falsified these surveys and (2) DENR actually considered the survey in calculating rates that it would pay environmental service providers.  Defendants, however, conceded during oral arguments that for the most part they knew that the rates they provided on the surveys were false. . . .

In August 2002, DENR published a[n] RFP for state lead work. The parties dispute NCESPA's reaction to the RFP and related

motivations. Plaintiffs allege that McClure and NCESPA responded to the RFP with a "two pronged course of action." First, plaintiffs allege that defendants organized a boycott of the RFP based on the claim that the request violated the Mini-Brooks Act. Second, defendants allegedly fixed the bids by having firms submit bids at the rates determined by NCESPA and its members. Plaintiffs allege that defendants' motivation in these two actions was to inflate the rates paid to the parties to whom the State awarded the contract and to impact the rate-setting process by preventing the State from using good faith bid information to set the RRD rate. . . .

Defendants claim that plaintiffs' allegations misrepresent defendants' actions. They claim to have legitimate concerns that DENR's RFP did indeed violate the Mini-Brooks Act. NCESPA members claim that they did not suggest rates to its members but merely attached the aforementioned reasonable rate survey which contained artificially inflated prices. Defendants concede that some NCESPA members submitted responses to the RFP with rates from the artificially inflated reasonable rate survey, while others did not respond or submitted rates not based on the survey.

Plaintiffs allege the responses were coordinated and nefarious and that defendants submitted bids at NCESPA-constructed rates. CBM, moreover, submitted a bid with NCESPA rates marked up by 20%. Defendants Hill and Almes, Hill's employer at the time, did not respond to the RFP. Plaintiffs also assert that bids submitted by defendants included a certification, under oath, of non-collusion by the bidders. DENR claimed that the coordinated use of the NCESPA rates and boycott constituted collusive behavior and hence subjected defendants to penalties because the signed certification by defendants violates N.C.G.S. § 143-54.

*McClure I*, 2004 NCBC 8 ¶¶ 7–18.

III.

MOTION FOR SUMMARY JUDGMENT

A.

LEGAL STANDARD

{12} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.R. Civ. P. 56(c). "It is not the purpose of the

rule to resolve disputed material issues of fact but rather to determine if such issues exist." N.C.R. Civ. P. 56 cmt. The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The Court must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

{13} In *McClure II*, the Court set forth its expectations for summary judgment in this matter:

> It will be incumbent on the State to show that the CBM bid was submitted as part of a conspiracy to permit one of the conspirators to obtain the contract at an artificially inflated price or for some other unlawful purpose which injured the State. That determination is best made at a later stage. Depending on the development of the facts, there may also be an issue of what DENR can recover under the statute [N.C. Gen. Stat. § 133-28] even if it is a strict liability statute. All the other defendants have settled and paid money to the State. If the monies paid thus far exceed ten percent of the contract price or the total actual damages, may DENR recover an amount in excess of that amount? For example, if there are twenty defendants can DENR sue each one for ten percent and recover two hundred percent of the contract price? If an amount equal to ten percent has already been collected, may DENR still recover more from CBM and Ross? Given DENR's position that there was price suppression it may well have to prove that a bid more than ten percent lower than the accepted bid would have been submitted. It may be able to do so. The reinstatement of this claim may muddy the waters in other respects. CBM and Ross could assert contribution rights against the other named defendants. What will be the result if they have already paid more than it is determined that CBM and Ross owe? Development of a record will assist this Court and the appellate courts in addressing these issues. For the foregoing reasons, the Court believes it erred in dismissing these claims at this time and will reinstate them.

2005 NCBC 6.  Based on the record that has been developed, the Court grants Plaintiffs' Motion for Summary Judgment for the reasons explained below.

B.

CONSPIRACY IN RESTRAINT OF TRADE

{14}   Section 133-28 of the General Statutes of North Carolina allows "any governmental agency entering into a contract which is or has been the subject of a conspiracy prohibited by G.S. 75-1 or 75-2" to sue the conspirators for damages. The existence of a conspiracy prohibited by sections 75-1 or 75-2 is a prerequisite to the applicability of section 133-28.

{15}   Section 75-1 states that "[e]very . . . conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."  Section 75-2 adds that any such conspiracy "which violates the principles of the common law" is considered a violation of section 75-1.  The meaning of the term "conspiracy in restraint of trade or commerce" is found in judicial interpretations of section 75-1.

{16}   First, "it is clear that North Carolina's substantive law of civil conspiracy . . . applies in the context of G.S. 75-1." *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 443, 293 S.E.2d 901, 918 (1982).  Civil conspiracy consists of four elements:  "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) which agreement results in injury to the plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Privette v. Univ. of N.C.*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989).  Injury to the plaintiff is an express element of civil conspiracy.  The mere existence of a conspiracy does not result in civil liability.  Rather, "[t]he gist of the civil action for conspiracy is the act or acts committed in pursuance thereof—the damage—not the conspiracy or the combination." *Reid v. Holden*, 242 N.C. 408, 414, 88 S.E.2d 125, 130 (1955).

{17}   To violate section 75-1, the civil conspiracy must be "in restraint of trade." In determining whether a conspiracy is "in restraint of trade," the Court looks to a body of federal and state cases analyzing the meaning of that phrase.  The federal cases are relevant because the language of section 75-1 is similar to language found

in the Federal Sherman Anti-Trust Act, which states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." Sherman Anti-Trust Act § 1, 15 U.S.C.S. § 1 (LEXIS through Pub. L. No. 110-25). The North Carolina Supreme Court has noted that "the body of law applying the Sherman Act, although not binding [on North Carolina courts] in applying G.S. 75-1, is nonetheless instructive in determining the full reach of that statute." *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973). Both the federal and state cases make clear that the Court's primary focus in determining whether a conspiracy is prohibited by section 75-1 should be the impact of the conspiracy on the competitive environment. In *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911), the United States Supreme Court construed the Sherman Act to reach the following:

> [A]ll contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed for the legitimate purpose of reasonably forwarding personal interest or developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy.

221 U.S. at 58; *see also United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041, 1049 (E.D.N.C. 1979) (applying North Carolina law and noting that "[c]ases applying the Sherman Act stress that the proper focus is upon the challenged restraint's impact on competitive conditions). As Adam Smith observed, a system of market exchange is fueled by self-interest:

> Give me that which I want, and you shall have this which you want . . . it is in this manner that we obtain from one another the far greater part of those good offices which we stand in need of. It is not from the benevolence of the butcher, the brewer, or the baker, that we expect our dinner, but from their regard to their own interest. We address

ourselves, not to their humanity but to their self-love, and never talk to them of our own necessities but of their advantages.

Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 15 (Edwin Cannan ed., Modern Library 1994) (1776). In a market economy, individuals and businesses are expected to pursue their own self-interest. When they do not, expectations are frustrated and competition suffers. The pursuit of personal interest is an important part of our economy, which the Supreme Court acknowledged by characterizing it as "legitimate" in the *Standard Oil* case. *See* 221 U.S. at 58. The specter of improper anticompetitive behavior is raised when firms counterintuitively neglect their self-interest.

{18} *Standard Oil* also reflects the common law "rule of reason" that a conspiracy to restrain trade must operate to the prejudice of the public in order to be actionable. Indeed, a "combination is not objectionable if the restraint is such only as to afford fair protection to the parties thereto and not broad enough to interfere with the interest of the public." *Rose*, 282 N.C. at 656, 194 S.E.2d at 531.

{19} One of the clearest examples of an activity in restraint of trade is an agreement or conspiracy between competitors in an industry to fix prices. In fact, "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*" under the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). The concept of price fixing under the antitrust laws is very broad. Explicit agreements to fix prices would clearly be illegal under the Sherman Act, "[b]ut so would agreements to raise or lower prices whatever machinery for price-fixing was used." *Id.* at 222.

C.

ANALYSIS

{20} In this case, the machinery for price fixing came in the form of an orchestrated effort to submit artificially high bids in response to a solicitation for bids from a state agency. The factual record developed by the parties shows that there is no genuine issue of material fact as to whether Defendants engaged in a

conspiracy prohibited by section 75-1. The Court's conclusion is based on a careful review of the record before it.

{21} In order for there to be a conspiracy, there must be an agreement to do an unlawful act. Here, the record demonstrates that Defendants agreed with others to unlawfully restrain trade. This was accomplished in two ways. First, the Stakeholders Group submitted an inaccurate reasonable rate survey to DENR. Second, NCESPA characterized the survey as representing "fair market rates" and strongly encouraged members to quote those rates to DENR during the RFP.

1.

SURVEY

{22} This Court has already observed that "Defendants . . . conceded during oral arguments [on the motion to dismiss] that for the most part they knew that the rates they provided on the surveys were false." *McClure I*, 2004 NCBC 8 ¶ 14. Defendant Bateman was one of nine industry representatives who "agreed to take the lead in developing proposed new rates and backup that will be presented to DENR." (McClure Aff. Ex. 6.) From its earliest days, the leaders of the Stakeholders Group were concerned that the new rates would adversely affect the bottom lines of environmental service providers. In a November 28, 2001 e-mail to the Stakeholders Group, Bateman said "[t]he time has come for us to help ourselves . . . . In case you haven't calculated, the new rates [which DENR planned to implement on January 1, 2002] will result in a net decrease to those who perform work in the program." (Bateman Dep. Ex. 10, May 30–31, 2006.)

{23} The leaders of the Stakeholders Group knew that "DENR is required to consider typical billing rates when determining what is reasonable and necessary." (McClure Aff. Ex. 3.) However, Defendants were part of an agreement to use the survey results not to reflect true market rates, but to present DENR with a set of rates that were above market. They were of the opinion that "[c]ompetition is healthy, but in some way this industry's competitiveness has been destructive." (McClure Aff. Ex. 8B.) Defendants sought to curb this destructiveness by coordinating the industry's response to the survey and subsequent RFP. While the

survey was out, McClure reminded the Stakeholders that "the reasonable rate document will be your checkbook for at least a year if not more." (Bateman Dep. Ex. 9.) When asked if there was "any effort to make sure that the rates that were reported were genuine market rates," Bateman responded that "the purpose of the survey was to find out what the market rates were," but did not otherwise indicate that any measures were taken to ensure the accuracy of the survey. (*See* Bateman Dep. 38: 7–11.)

{24}   After the survey results were returned, representatives of several environmental consulting firms, including CBM president Ken Czoer, met to review, compile, and refine responses to the survey. (McClure Aff. ¶ 3.) After removing the outliers, the group rounded most of the averages upward. (McClure Aff. ¶ 4.) The survey results were characterized as "fair market rates" and submitted to DENR on January 11, 2002. (McClure Aff. Ex. 43; Bateman Dep. Ex. 18.) Defendant Bateman agreed with the characterization of the survey results and the submission to DENR. (Bateman Dep. 133:5.)

{25}   Scott Ryals, an employee of the Trust Fund Branch for the Underground Storage Tank Section of DENR's Division of Waste Management testified that "[t]he rates in the survey provided to DENR in January 2002 were approximately forty percent (40%) higher than the RRD then in effect," not including the twenty percent markup that NCESPA was requesting be added to the rates provided. (Ryals Aff. ¶ 8.)

{26}   The survey was not what it purported to be. It was presented to NCESPA members and DENR as a survey of "fair market rates," but actually presented above market rates. As shown below, the survey results were attached to an e-mail sent to NCESPA members in advance of the RFP (McClure Aff. Ex. 43) and were the basis of bids submitted to DENR by various firms.

2.

BROADCAST E-MAILS

{27}   The second aspect of the conspiracy was an agreement and scheme on the part of Defendants and others to have firms submit bids at the "fair market" rates

determined by NCESPA as a result of the survey. This was accomplished by sending e-mails to environmental service providers ("ESPs") in advance of a bidding process for the state lead contract. Defendant Bateman was part of the group responsible for drafting these e-mails (*see* McClure Aff. Exs. 13–42 (series of e-mails between NCESPA directors discussing the broadcast e-mail)) and ultimately gave her approval to the final version (McClure Aff. Ex. 42 (stating "I am in, send it")). There is ample evidence in the record demonstrating that the intent of the e-mail was to unite ESPs in an effort to present bids that were driven by the NCESPA survey, not by market forces or the self-interest of the individual firms competing for the contract. The board believed that DENR's ulterior motive in issuing the RFP was to use the bids as data in creating a new RRD. John Hill stated early on that "[m]y opinion is they are looking for backup material for STF reasonable rates." (McClure Aff. Ex. 9.) McClure agreed that

> they will certainly use any rates they receive on this as ammunition against us for Reasonable Rate Document discussions. It will also validate their belief that in the end they can divide us by pitting us against us in a bidding war. In my opinion, the best thing that could happen would be for noone [sic] to respond to this.

(McClure Aff. Ex. 9.) The first line of the broadcast e-mail seemed to discourage any response at all by warning ESPs that "the recent solicitation for State lead contractors (RFP 16-N03001) by NCDENR may be in violation of the Mini-Brooks Act." (McClure Aff. Ex. 43.) The Mini-Brooks Act restricts public works contracts from requiring bids for certain engineering and other work. *See* N.C. Gen. Stat. § 143-64.31 (LEXIS through 2007 legislation). However, the directors had concluded prior to sending the e-mail that "[t]he solicitation itself is not in violation of Mini-Brooks." (McClure Aff. Ex. 19.) Yet NCESPA never communicated this conclusion to its members. (Bateman Dep. 104:11–12.) Rather it left them with the impression that DENR's solicitation might have been illegal.

{28} NCESPA treated the RFP not as a competitive bidding process, but as an opportunity to prove itself a formidable organization to DENR. In an August 13, 2002 e-mail to the board, McClure noted that

> if any firms responds [sic] to this solicitation and submits prices at or below the current reasonable rate document, it will begin to undermine everything we are fighting for. If a NCESPA member firm submits anything less than what we have proposed as reasonable rates, I think it severely undermines our position. I think this is one of the first instances where we will see if NCESPA has any teeth to it. The response the State gets on this will go a long way in how they view us as an organization.

(McClure Aff. Ex. 13.) McClure also believed that "[t]he best show of strength for our organization would be to have multiple firms submit the fair market rates determined by NCESPA." (McClure Aff. Ex. 33.) Defendant Bateman also viewed the RFP as a chance to prove NCESPA's strength, noting in an August 15, 2002 e-mail that "I think they are watching to see how strong we will be." (McClure Aff. Ex. 32.) The broadcast e-mail ultimately stated that

> NCESPA feels that submittal of costs that are below fair market rates under this solicitation or any similar solicitation could ultimately be used in development of the reasonable rate document (RRD). When considering your response to this solicitation, we strongly encourage our members to keep these points in mind along with the considerable amount of work performed by NCESPA with respect to the RRD. The fair market rates researched and developed by NCESPA are attached to this e-mail.

(McClure Aff. Ex. 43.) The "fair market rates" came from the survey, which had been manipulated.

{29} The intent of the e-mail was to influence the bids submitted by ESPs to the State. The NCESPA rates were attached to the e-mail. Language in the e-mail implied that if a firm pursued its self-interest by bidding lower than the NCESPA rates, that firm would be hurting the entire industry.

{30} The drafters of the broadcast e-mail knew they were on thin ice and were aware of the shadow cast by the antitrust laws. At the NCESPA interim board of

directors meeting on May 7, 2002, the group "discussed the need for a disclaimer about price fixing before each meeting" (Bateman Dep. Ex. 15), but never approved such a disclaimer (Bateman Dep. 53: 21). An early draft of the broadcast e-mail stated, "NCESPA advises its non-engineering services providers who wish to respond to submit the reasonable rates researched and endorsed by NCESPA." (McClure Aff. Ex. 16.) John Hill advised the directors to "LET US be very careful. This is an open bid and we can not [sic] go around talking about rates or how we should respond." (McClure Aff. Ex. 10.) Keith Anthony was concerned that "we might come off as looking like we are all in collusion by all of us (NCESPA) sending in the same rate structure or even suggesting as much in an e-mail or worse yet the web site." (McClure Aff. Ex. 14.) McClure brushed aside these concerns, asking "so what if we get accused of collusion? Is that a bad thing? It shows that we are strong and united as a group." (McClure Aff. Ex. 16.) He went on to say, "I doubt very seriously that the State will attempt to sue anyone over this." (McClure Aff. Ex. 16.)

{31} The language was ultimately softened. The e-mail "strongly encouraged" members to remember "the considerable amount of work performed by NCESPA with respect to the RRD." (McClure Aff. Ex. 43.) Members were reminded that "[t]he fair market rates researched and developed by NCESPA are attached to this e-mail." (McClure Aff. Ex. 43.) Although the final e-mail does not explicitly direct members to submit the NCESPA rates, the implication is clear. The drafters intended to imply as much as possible without overtly telling members what rates to submit, as indicated by the following comment by Pete Byers: "In addressing John's comments regarding telling nonengineering firms to respond to the RFP with the NCESPA rates, I feel we can accomplish this by informing them of these rates and how they were obtained . . . . However, I would lean away from telling anyone what rates to submit." (McClure Aff. Ex. 29.) Defendant Bateman advocated edits that would "steer us further away from discussing rates, markups, and providing a fresh copy of the rates." (McClure Aff. Ex. 34.) It was not necessary to explicitly tell firms to submit the NCESPA rates because "[t]he work and rates are known by

those to whom we will send this message." (McClure Aff. Ex. 34.) In the final draft, McClure "tried to soften this proposal . . . while still getting our point across." (McClure Aff. Ex. 33.) The point was to get multiple firms to submit the NCESPA rates. Overall the board was oblivious to the possible consequences of their actions. Any concerns over collusive behavior were quickly brushed aside as the board agreed to transmit the broadcast e-mail.

{32} Bateman approved the final draft of the broadcast e-mail. (McClure Aff. Ex. 42.) She testified that before she gave her approval, she consulted with Morris Caddell, a Charlotte attorney who frequently advised CBM on a number of issues, and forwarded to him a series of e-mails between the NCESPA directors which included the proposed broadcast e-mail. According to Bateman, "Morris told me that he saw no problem with what was being proposed as far as sending out . . . the broadcast e-mail." (Bateman Dep. 192: 18–20.) She did not approve the broadcast e-mail until after she heard from Mr. Caddell because she "wanted his opinion before [she] entered into any discussions related to this or agreed to send out any broadcast e-mails." (Bateman Dep. 193: 8–10.) But Mr. Caddell testified that the purpose of his conversations with Bateman regarding the e-mails was to advise her on a course of action for CBM alone. (Caddell Dep. 17:2–6.) According to Caddell,

> It was more of a conversation about what would be the issues, because I would have had to do some in-depth research to actually give a legal opinion, a final yay or nay on whether or not it was legally valid to send it [the broadcast e-mail] out or not, and I had not done that kind of research. And I didn't think I was being requested to, but again, I think it was more just general sort of bringing me up to speed that . . . [the broadcast e-mail was] being kicked around, but it probably wasn't going to go out.

(Caddell Dep. 16: 15–25.)

{33} Some of the most compelling evidence of the NCESPA board's agreement to restrain trade comes after the broadcast e-mail was sent and firms began to respond to the RFP. First, the board members' firms submitted the NCESPA rates. In a September 6, 2002 e-mail to the board, Defendant Bateman notified them that

she was "going to send the NCESPA rates plus 20%." (McClure Aff. Ex. 55B.) Keith Anthony responded that "I too am submitting the NCESPA rates plus 20%." According to Bateman, she notified the others of the amount of her bid because the bid was submitted to DENR "for informational purposes only." (Bateman Dep. Ex. 34.) This informational bid was sent to DENR, but CBM requested that DENR return it unopened because DENR had clarified issues regarding the Mini-Brooks Act in the interim. (Bateman Dep. 147: 3–10.) Bateman instructed CBM employee Kim Freeman "[t]o remove the letter stating that it was a non-bid and re-submit it in the bid package as required." (Bateman Dep. 177: 4–9.) The consequence of all this is that Bateman had informed the other NCESPA board members how CBM was going to respond to the RFP. (*See* Bateman Dep. 149: 10–13.)

{34} Other firms clearly got the message that they were to use the NCESPA rates. Representatives from two firms even called McClure to ask whether to use the proposed NCESPA rates or the proposed rates plus 20%. (McClure Aff. Ex. 44.) These inquiries indicate that at least some member firms' submissions were guided by the NCESPA rates, rather than their professional judgment as to what rate would be best for their business and give them the best chance of obtaining the state lead contract.

{35} The NCESPA board clearly did not want members to pursue their self-interest as they normally would in a competitive environment. After the bidding had opened, McClure wanted to obtain the bid results in order to find out what members had bid. He stated that "[i]f some firms did go in and undermine our efforts, I think it would be good to know who is 'on our team' and in it for the long haul and who is out for themselves and short term gain." (McClure Aff. Ex. 57.) In a competitive market, there are no "teams" of firms. Rather, firms are supposed to be "out for themselves." Defendant Bateman agreed with McClure that it would be a good idea to try and obtain the bids through the Freedom of Information Act or other public records laws. (Bateman Dep. 164:16 (stating "I did not disagree with getting the FOI").) Keith Anthony said that "I submitted the NCESPA rates and I want to know what members lowballed it." (McClure Aff. Ex. 63.) Bateman

testified that she believed she was tasked with requesting the bid information under the Freedom of Information Act, although the actual request may have been sent in by someone else. (Bateman Dep. 164: 3–6.)

{36} All of this evidence leads to the conclusion that the NCESPA board, including Defendant Bateman and her company, CBM, entered into an agreement to restrain trade as that phrase has been defined by the courts. As a result of the broadcast e-mails, the bidding process for the state lead contract was not competitive. Firms were essentially told what rates to submit. Those that did not submit these rates were branded traitors to the cause, and were sought out by the NCESPA leadership for retribution. The cases make clear that an agreement to raise or lower prices violates the antitrust laws "whatever machinery for price fixing was used." *Socony-Vacuum*, 310 U.S. at 222. Here, the machinery consisted of an inflated survey of purportedly "fair market" rates and a coercive e-mail encouraging members to submit those rates.

{37} The term "restraint of trade" is broad enough to include collusively providing false market data that will be used to set prices. In *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), the plaintiff milk producers claimed that the defendant cheese makers conspired to depress the prices they paid for milk produced in California. *Id.* at 982. In that case, the California Department of Food and Agriculture used the bulk cheese price from the National Cheese Exchange in its formula for setting the minimum price for California milk. *Id.* The cheese makers allegedly rigged the price for bulk cheese in order to both decrease the cost of bulk cheese and California milk. *Id.* The Ninth Circuit reversed the District Court's order dismissing the plaintiff milk producers' claims. The court noted that "[r]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *Id.* at 986 (quoting *NCAA v. Board of Regents*, 468 U.S. 85, 107–8 (1984)).

{38} In *Socony-Vacuum*, prices of gasoline sold by major oil companies were controlled by spot market prices. The oil companies engaged in buying programs that "at least contributed to the price rise and the stability of the spot markets, and

to increases in the price of gasoline sold in the Mid-Western area during the indictment period." *Id.* at 219. In *Socony-Vacuum,* "[c]ompetition was not eliminated from the markets; but it was clearly curtailed, since restriction of the supply of gasoline, the timing and placement of the purchases under the buying programs and the placing of a floor under the spot markets obviously reduced the play of the forces of supply and demand." *Id.* at 220. Justice Douglas also noted that

> prices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon. And the fact that . . . they are fixed at the fair going market rate is immaterial. For purchases at or under the market are one species of price-fixing.

*Id.* at 222.

{39} Defendants' actions are a restraint of trade as that term is defined in the *Knevelbaard Dairies* and *Socony-Vacuum* cases. Defendants participated in drafting and approving the transmission of an e-mail to a number of ESPs that were going to be participating in a state lead contract. The intent of this e-mail was to influence the prices the firms submitted. The evidence shows that a number of firms, including Defendant CBM, submitted the NCESPA rates, rather than a rate they determined to be in their best interest. As noted above, the NCESPA rates were inflated. But as *Socony-Vacuum* makes clear, Defendants' acts would still be in restraint of trade even if the survey was an accurate reflection of the fair market rates. Competition consists of firms pursuing their self-interest and submitting bids that will give them the best chance of obtaining the contract. When all firms get together beforehand and agree to submit similar prices, competition is stifled. In her deposition, Defendant Bateman noted that CBM submitted a bid because "it was real prices for real work, and I wanted them to look at it," not because she thought CBM would be awarded the contract. (*See* Bateman Dep. 317:16–17.) One of her reasons for submitting the bid was so that it would be before DENR in the

event they used the bids to create the new RRD. (Bateman Dep. 317:23–318:1.) The bid ultimately submitted by CBM was based on the NCESPA rates, rather than the rates CBM was then charging its customers, as reflected in the following exchange from Bateman's deposition:

Q. Why in your second submission did you not submit the CBM rates?

A. Because we submitted the NCESPA rates. They were reasonable for the work that was going to be done supposedly.

Q. But they were not your rates at the time?

A. That's right.

(Bateman Dep. 246:15–21.) Here, the State was deprived of competition in the RFP and provided with inflated bids in order to affect DENR's determination of the RRD.

{40} Defendant Bateman was a participant in the conspiracy. Throughout her deposition, she claims to have disagreed with the thoughts and attitudes of her fellow board members on many occasions; but on no occasion does she appear to have made her disagreement known to the board or anyone else. Furthermore, she was complicit in the board's actions by assenting to them, giving her seal of approval, and in some cases helping to carry the board's plans into action. There are several examples of this pattern.

{41} On May 17, 2002, Bateman sent an e-mail to the new NCESPA group that included a letter from NCESPA president Darin McClure (Bateman Dep. Ex. 16.) In the letter and as noted above, McClure stated that "[c]ompetition is healthy but in some ways this industry's competitiveness has been destructive." (Bateman Dep. Ex. 16.) The letter was from McClure but also included the names and telephone numbers of the NCESPA board of directors, including Bateman. When asked whether the board approved the letter, Bateman responded "I don't know that we went through a formal board meeting for approval." (Bateman Dep. 54: 17–20.) She also testified that she disagreed with McClure's choice of words that competition had been destructive in the ESP industry. (Bateman Dep. 54:25–55:7.) Bateman testified that she "probably" voiced her concerns, but couldn't recall

specifically whether she made her concerns known. (Bateman Dep. 55: 8–12.) Despite "absolutely" disagreeing with McClure's statement, Batemen sent the e-mail anyway, with her name and telephone number listed at the bottom. (*See* Bateman Dep. 56: 7–11.)

{42} Bateman also testified that she disagreed with a number of things said in e-mails between NCESPA board members in August of 2002. On August 13, McClure wrote that

> if any firms responds [sic] to this solicitation and submits [sic] prices at or below the current reasonable rate document, it will begin to undermine everything we are fighting for. If a NCESPA member firm submits anything less than what we have proposed as reasonable rates, I think it severely undermines our position. I think this is one of the first instances where we will see if NCESPA has any teeth to it. The response the State gets on this will go a long way in how they view us as an organization.

(McClure Aff. Ex. 13.) Once again, Bateman testified that she disagreed with these statements. (Bateman Dep. 119:5–25.) However, the next e-mail in the record from Bateman to the NCESPA board (Bateman Dep. Ex. 26) contains no statements that she disagreed with the writings of McClure and others. Bateman testified that she disagreed with the ideas being discussed in the e-mails, but couldn't recall where she voiced her disagreement. (Bateman Dep. 120: 11–19.) Bateman also testified that she disagreed with Keith Anthony's statements reflecting his anger at firms who had "low-balled" the bid. However, she didn't know whether she responded to his e-mail or if she communicated her disagreement to any other members of the board. (Bateman Dep. 169: 4–14.)

{43} Bateman's counsel asked her, "do you know of any rule or requirement by NCESPA or any other organization that you belong to that you have to agree or disagree with statements made by someone else in writing, verbally, or otherwise?" (Bateman Dep. 186: 18–22.) Bateman responded in the negative. (Bateman Dep. 186: 23.) Although such a requirement may not have been in place, Plaintiffs' Motion for Summary Judgment requires the Court to evaluate the evidence before

it. Bateman has testified that she disagreed with various acts of NCESPA board members, but her actions are not in conformity with such disagreement. Bateman has presented the Court with no documents reflecting her disagreement. In her deposition testimony, she is unable to specify when or if she made her disapproval known to the rest of the board. Most troubling of all, Bateman approved the NCESPA board's actions in spite of her disagreement. She sent the e-mail to potential NCESPA members along with the letter from McClure, and allowed her name to be included on the letter stating that competition in the ESP industry had been destructive. She approved the transmission of the broadcast e-mail and its recommendation to use the NCESPA rates despite her concerns about collusion. She submitted CBM's bid with the NCESPA rates in compliance with the conspiracy. She took part in the efforts to locate firms who low-balled the bid. The record here clearly indicates that Bateman and CBM participated in the conspiracy.

{44} Furthermore, the conspiracy they helped advance injured the public. A conspiracy to restrain trade must operate to the prejudice of the public in order to be actionable. In this case, the public was injured because a state agency was deprived of a competitive bidding process as the result of an agreement between firms in the environmental services industry. There existed an intent to artificially inflate the RRD rates as well. According to Dexter Matthews, Director of the Division of Waste Management of DENR, the agency "was made aware if the allegations against certain companies surrounding their bids to the August 8, 2002 RFP, but determined that it was in the best interest of DENR to move forward with the information collected from the RFP, because comparison of the competitive market data collected from responses to the RFP to the RRD then in effect showed that the rates needed to be adjusted downward to reflect market prices." (Matthews Aff. ¶ 8.) The "competitive market data" was comprised of the bids after the collusive bids were removed. However, Mr. Matthews concluded that even the noncollusive bids were skewed upward because "the recipients of the emails who responded to the RFP knew that there was a concerted effort to get engineering firms not to respond and to get responding firms to submit inflated bids, and

therefore that competition for the contracts would likely be blunted." (Matthews Aff. ¶ 9.) DENR used upwardly skewed numbers to formulate the revised RRD, and was also damaged by the suppression of competitive bidding on the RFP.

{45} The record also contains sufficient evidence to conclude that there was injury as a result of the conspiracy. Testimony indicates that a number of firms would have submitted lower bids in the absence of a conspiracy. McClure stated that "[i]n the absence of concerns about DENR's use of the responses to the RFP in formulating a new Reasonable Rate Document, Mid-Atlantic likely would have submitted at least some lower figures in response to that RFP than it ultimately submitted." (McClure Aff. ¶ 6, Ex. 12.)

{46} In sum, the facts show that there was a conspiracy in violation of section 75-1 and 75-2. Defendants Bateman and CBM have not presented the Court with any evidence to call these facts into question or to rebut the evidence of their participation in the conspiracy. The existence of the conspiracy is admitted by the other conspirators. The goal of the conspiracy was to artificially inflate the market price information DENR used to set its rates for reimbursement and for state lead work. In short, the conspirators sought to inflate prices by artificially and dishonestly manipulating the information used to establish the RRD.


IV.

DAMAGES

{47} Based on the foregoing, DENR entered "into a contract which is or has been the subject of a conspiracy prohibited by G.S. 75-1 or 75-2 . . . ." *See* N.C. Gen. Stat. § 133-28(a). The specific contracts DENR entered into were pursuant to the RFP, the bids for which were improperly influenced by NCESPA. DENR awarded two contracts pursuant to the RFP, one to Force Environments Service Company, LLC and another to Geological Resources, Inc. (Ryals Aff. ¶ 15.) Under section 133-28(b), DENR is allowed to choose the measure of damages, which "shall be either the actual damages or ten percent (10%) of the contract price which shall be trebled as provided in G.S. 75-16."

{48}   In this case, DENR has elected to recover ten percent of the contract price, trebled.  (Mem. Supp. Pls.' Mot. Summ. J. 23.)  The total contract price is equal to the sum of the amounts paid under the Force Environmental and Geological Resources contracts:

$852,008.37  Force Environmental Contract
+   916,107.44  Geological Resource Contract
  1,768,115.81  Total Contract Price

Ten percent of the total contract price is $176,811.58.  Trebled, this amount comes to $530,434.74.

{49}   Thus, ten percent of the contract price trebled is $530,434.74.  This is the amount owed to DENR under section 133-28.  The Court has no discretion to adjust this amount.  Ten percent of the contract price is trebled "as provided in G.S. 75-16."  N.C. Gen. Stat. § 133-28(b).  Section 75-16 states that "if damages are assessed . . . judgment shall be rendered in favor of the plaintiff against the defendant for treble the amount fixed by the verdict."  In *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981), the North Carolina Supreme Court concluded "that the Legislature intended trebling of any damages assessed to be automatic once a violation is shown."  *Id.* at 547, 276 S.E.2d at 402.  Automatic trebling of damages leaves no room for judicial discretion.  *Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 715 (4th Cir. 1983).

{50}   Although the amount of damages is fixed by statute and the State's election thereunder, the Court must consider that a portion of the damages has already been paid by some of the former Defendants in this action.  In a Consent Decree and Order of Dismissal dated December 13, 2004, Defendants McClure, Proctor, and Mid-Atlantic agreed to pay civil penalties to the North Carolina Department of Justice and damages to DENR as follows:

| Defendant | Penalties | Damages |
|---|---|---|
| Mid-Atlantic | $100,000 | 80,000 |
| McClure | 60,000 | |
| Proctor | 10,000 | |

The damages amount paid by Mid-Atlantic included "$60,000 to resolve DENR's statutory damages claims under N.C.G.S. § 133-28." (Consent Degree and Order of Dismissal Regarding Darin M. McClure, Thomas A. Proctor, and Mid-Atlantic Associates, Inc., Dec. 13, 2004 § IV.)

{51}    Defendants Shield Engineering and S&ME also entered into consent degrees and each agreed to pay $60,000 to resolve DENR's claims under section 133-28. (Ryals Aff. ¶ 16.) Thus the total amount paid so far in satisfaction of the 133-28 claims is $180,000.[2]  The amount remaining to be paid is as follows:

| | | |
|---|---|---|
| | $530,434.74 | Ten percent of contract price, trebled |
| - | 180,000.00 | Already paid in settlement |
| | 350,434.74 | Remaining to be paid |

DENR is entitled to recover this amount from Defendants Bateman and CBM, who are jointly and severally liable as the only remaining defendants in this action. The other defendants were free to negotiate settlements with the State. The Mid-Atlantic group paid a total of $250,000 in settlement of the State's claims for civil penalties and damages. Shield and Anthony paid a total of $210,000. S&ME, Quarles, and Einsman paid a total of $180,000. Other defendants paid a total of $95,000 in settlement of the State's claims for civil penalties. The State may recover the remainder of its statutory damages from Defendants Bateman and CBM.

V.

CONCLUSION

{52}    Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiffs' Motion for Summary Judgment is GRANTED. Plaintiffs may recover damages in the amount of $350,434.74 from Defendants Bateman and CBM and Judgment is hereby entered in favor of Plaintiff DENR in that amount.

---

[2] In settling its section 133-28 claims with the Mid-Atlantic, Shield, and S&ME for $180,000, the State ensured it would recover at least ten percent of the contract price.

IT IS SO ORDERED, this the 19th day of July, 2007.